**28UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

------------------------------------------------------

| | |
|---|---|
| Michael Bachemin, by and through Tutrix and next friend Anna Bachemin, | |
| Plaintiff, | **CASE NO. 22-cv-_____** |
| v. | **JUDGE _____** |
| DDMS, LLC; DDMS OF LOUISIANA, LLC; DDMS OF LOUISIANA NO. 2, LLC; DDMS OF LOUISIANA NO. 3, LLC; and DDMS OPERATIONS, LLC, | **MAGISTRATE JUDGE _____** |
| Defendants. | |

------------------------------------------------------

## COMPLAINT

Now comes Plaintiff, Michael Bachemin, a natural person, by and through his Tutrix and next of friend Anna Bachemin, who respectfully avers as follows:

1.     This lawsuit arises out of the injury, neglect, abuse, and disability-related discrimination experienced by Mr. Bachemin., an individual with severe intellectual disability and autism, while in the care of Defendants. Mr. Bachemin has a severe intellectual disability and autism, is unable to care for himself, and is unable to meaningfully communicate his needs in a consistent manner.

2.     Mr. Bachemin was placed into a group home for individuals with disabilities so that he would have full time supervision and to ensure that his needs were met. Specifically, Mr. Bachemin was placed into the Bessemer Group Home, located in Kenner, Louisiana, which is operated by Defendants.

3.     At the Bessemer Group Home, Defendants were responsible for taking care of Mr. Bachemin's needs, supervising Mr. Bachemin, ensuring that the housing and auxiliary features

1

were safe for Mr. Bachemin and others, and protecting Mr. Bachemin from internal and external dangers. Tragically, as a result of Defendants' failure to supervise and/or failure to protect, Mr. Bachemin was severely burned while at the Bessemer Group Home. Once the burns were discovered, Mr. Bachemin was hospitalized and underwent surgery for the severe burns.

4.      When Mr. Bachemin was unsupervised at the Bessemer Group Home, he swallowed several inedible and dangerous objects, including a wrench.

5.      But for Defendants' neglect, failure to supervise, failure to train, and failure to follow internal policies and procedures, Mr. Bachemin would not have been horribly burned and injured while in Defendants' care and custody. As is set forth below, and as will be shown at trial, Mr. Bachemin's personal injuries were a direct and foreseeable consequence of the negligence, abuse, and/or neglect of Defendants.

## JURISDICTION AND PARTIES

6.      Mr. Bachemin, Plaintiff, is currently domiciled in Orleans Parish, Louisiana. At the time the incident occurred, he was domiciled in Jefferson Parish, Louisiana. Plaintiff appears herein through his tutrix, Anna Bachemin. Ms. Bachemin was confirmed and appointed as continuing tutrix for Mr. Bachemin by order of the Civil District Court for the Parish of Orleans, case no. 92-794. As the court-appointed tutrix for Mr. Bachemin, Ms. Bachemin has authority to commence litigation on Mr. Bachemin's behalf.  Ms. Bachemin is a Louisiana citizen.

7.      Defendants, DDMS, LLC, DDMS OF LOUISIANA, LLC, DDMS OF LOUISIANA NO. 2, LLC, DDMS OF LOUISIANA NO. 3, LLC, and DDMS OPERATIONS, LLC (hereinafter "Defendants") are limited liability companies incorporated in states other than Louisiana and, upon information and belief, are doing business in Jefferson Parish, Louisiana. One or more of the Defendants own and/or operate the Bessemer Group Home located in Jefferson Parish, Louisiana. Defendants had a duty, responsibility, and obligation to supervise the residents

2

of the Bessemer Group Home and ensure that the conditions at the Bessemer Group Home were safe for the residents of said facility.

8.      Upon information and belief, none of the members of Defendants are citizens of Louisiana.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. Mr. Bachemin is domiciled in Orleans Parish, Louisiana and, upon information and belief, Defendants, through their members, are not domiciled in Louisiana. Because of Mr. Bachemin's severe burns, which required surgery, it is clear that the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

10.     On their website, Defendants claims that it "provides services and support to approximately 840 people nationally, with nearly 150 locations in ICF/IID, group home, apartments, and home and community-based services in the states of Texas, Louisiana, Tennessee, Illinois, Alabama, Utah and Florida."

11.     Defendants also claim on their website that "We're your advocate" and claim that this means:

- "Advocates assist people with making sure their rights are respected.
- They operate independently of government agencies, the Health and Disability Commissioner, and the funders of health and disability services.
- Advocates are there to support you, encourage you to take action and to help you resolve your concerns or issues."

12.     Curiously, however, on their website, Defendants focus on their financial prowess. Specifically, Defendants state "We're Accountants." Indeed, Defendants' website states that their leadership is composed of financially-trained professionals—not individuals with formal education related to individuals with disabilities.

13.     Upon information and belief, Defendants' Chief Executive Officer, Mr. Terry Swatley, is not a medical doctor, psychologist, psychiatrist, or educator. Instead, he has a bachelor's degree and a Certified Professional Accountant (CPA) certificate.

14.     Upon information and belief, Mr. Terry Swatley's bachelor's degree is in accounting or finance and he does not have degrees with an emphasis in individuals with disabilities.

15.     Defendants' President, Mr. Wayne T. Addison, received both a Bachelor of Business Administration and a Masters of Business Administration from the University of Memphis.

16.     Defendants' Chief Financial Officer, Mr. Michael Wills, graduated from the University of Memphis and holds a CPA certificate.

17.     Defendants' Chief Administrative Officer, Drew Bringhurst, received a Bachelor of Business Administration from Christian Brothers University.

18.     Defendants' Corporate Controller, Mr. Dan Scott, received a Bachelor of Science in Accounting from Arkansas State and also holds a CPA certificate.

19.     Defendants do not list any other senior management or executives on its website.

20.     Defendants' leadership is not composed of individuals who are medical doctors, psychologists, psychiatrists, or educators.

21.     Thus, despite Defendants' claim that they are "advocates," Defendants' leadership is not composed of individuals who have formal education in individuals with disabilities, their housing needs, or their safety requirements.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides within the jurisdiction of this District and a substantial part of the events that give rise to the claims occurred in this District.

## FACTS

23.     In 2021, Mr. Bachemin was a resident of, and was domiciled in Jefferson Parish, Louisiana.

24.     Mr. Bachemin is an individual with a disability, specifically, autism, severe intellectual disability, impulse control disorder, and unspecified psychosis.

4

25.     As a result of his disability, Mr. Bachemin is unable to care for himself and is unable to meaningfully communicate his needs in a consistent manner.

26.     Mr. Bachemin is unable to comprehend most tasks presented to him. When asked a question, Mr. Bachemin will frequently repeat the question back without providing any answer. An assessment of Mr. Bachemin reveals that he is within the severe mentally deficient range of intelligence.

27.     Despite his challenges, Mr. Bachemin is capable of very basic communication. However, it is difficult to ascertain if his communication accurately reflects the things he wishes to say.

28.     Mr. Bachemin likes to watch television, go to parades, spend time outside, and go on car rides with his family members.

29.     While Mr. Bachemin frequently has difficulty expressing himself, he very much experiences emotions, feelings, and anxiety. Mr. Bachemin is diagnosed with generalized anxiety disorder.

30.     Mr. Bachemin requires assistance to safely control the water temperature for his showers or baths.

31.     Given his severe disability and inability to care for himself, and to ensure that his needs were met, Ms. Bachemin arranged for Mr. Bachemin to receive support and services from Defendants at the Bessemer Group Home, a group home for individuals with disabilities.

32.     The Bessemer Group Home is located in Kenner, Louisiana and is owned and/or operated by Defendants. The Bessemer Group Home is an intermediate care facility for people with developmental disabilities, *see* La. R.S. 40:2180(2), which receives federal and state funding under Medicaid, 42 U.S.C. §1396 *et seq.*, to provide services, including residential services, to people with developmental disabilities.

5

33.     As the owners and/or operators of the Bessemer Group Home, Defendants are charged by law, pursuant La. R.S. 28:452.1, with providing Mr. Bachemin with developmental disabilities services and supports that are consistent with his personal needs and choices in the most integrated setting appropriate, and in a manner that addresses his desires and goals in a respectful and least intrusive manner.

34.     Defendants are also charged by law with the duty to provide Mr. Bachemin with the assistance and supervision he needs in order to protect him from harm.

35.     At all times pertinent to this action, Defendants have been responsible under law for developing and implementing a Comprehensive Individual Support Plan in accordance with La. R.S. 28:452.1 and La. R.S. 28:451.2 that is supposed to address Mr. Bachemin's physical, behavioral, social, communication, medical, and safety needs.

36.     Mr. Bachemin's family selected the Bessemer Group Home based on an expectation and understanding that it would be a safe environment for Mr. Bachemin, that Mr. Bachemin would be supervised, and that Defendants would meet Mr. Bachemin's needs. These expectations were specifically elucidated by Anna Bachemin to employees of the group home at the time of Mr. Bachemin's placement.

37.     In operating various group homes across the country, Defendants maintain various written policies and procedures that their staff are obligated to follow. One of these policies is Policy Number 12.308, entitled "Domestic Hot Water Temperature Control," and pertains to safe usage of hot water in a group home setting.

38.     Pursuant to Defendants' Policy Number 12.308 (hereinafter the "Water Policy"), Defendants, through their staff, "shall assure that the temperature of domestic hot water in the facility shall not be in excess of 110° to assure the safety of the individuals."

39.     The Water Policy requires each facility to keep a written record of temperatures at all domestic hot water outlets, including in kitchen and bathroom sinks, laundry room sinks, mop closet sinks, and in each bath and/or shower.

40.     The Water Policy requires the facility's administrator to ensure that the facility staff are trained to properly take water temperatures and assure that only trained staff record temperatures.

41.     The Water Policy requires that a specific water temperature log form be maintained for each outlet of hot water.

42.     The Water Policy requires that the water temperature be checked daily to ensure that the temperature is not in excess of 110° and, at each bath and shower, prior to the first bath or shower.

43.     Under the Water Policy, the facility staff are obligated to immediately report any hot water source that does not meet the temperature requirement.

44.      Under the Water Policy, the facility staff are obligated to immediately stop any hot water source with a temperature in excess of 110° from being used. Resumption of use of that water source cannot recommence until the water source has been corrected or repaired.

45.     Under the Water Policy, facility staff are not permitted to heat water to wash dishes, bathe individuals, etc. Only water from a temperature controlled hot water system is permitted.

46.     Pursuant to Defendants' Policy Number 12.307 (hereinafter the "Mixing Valves Policy"), Defendants, through their staff, "shall fit all hot water tanks with a mixing valve suitable for the size and type of hot water heater in use to assure the hot water temperature at bathroom and kitchen sinks, tubs and/or showers used (or could be used) by individuals living at the facility or home, does not exceed 110 degrees."

47.     The Mixing Valves Policy requires the Maintenance Director to have a certified technician install a correct size mixing valve at each facility or home's hot water tank to assure that the resulting water temperature does not exceed 110 degrees.

48.     The Mixing Valves Policy requires the Maintenance Director to have all mixing valves be inspected by a certified technician annually to assure settings are correct and the mechanism is functioning properly.

49.     The Mixing Valves Policy works in tandem with the Water Policy. In particular, if, the water temperature exceeds 110 degrees during regular monitoring, the supervisor must be notified immediately and shall complete a Maintenance Request Ticket. Further, if the temperature exceeds 110 degrees for three consecutive monitoring instances, or, if the temperature exceeds 125 degrees during any monitoring, the Maintenance Director must notify the Administrator to determine if a certified technician should be called to replace or repair the malfunctioning mixing valve.

50.     Upon information and belief, despite the existence of the Water Policy, Defendants do not have a procedure as to whom will train staff on the Water Policy.

51.     Upon information and belief, despite the existence of the Water Policy, Defendants do not have a policy or procedure as to when said trainings will occur.

52.     Upon information and belief, despite the existence of the Water Policy and Mixing Valves Policy, Defendants do not have a procedure or practice to follow these policies, such as to ensure the water temperature is checked daily and the hot water tank or its mixing valve(s) are functioning properly.

53.     Upon information and belief, despite the existence of the Water Policy and Mixing Valves Policy, Defendants do not have a procedure or practice to follow these policies, such as to servicing or inspecting hot water tanks or their mixing valve(s) based on regular monitoring of water temperature.

54.      On August 11, 2021, around approximately 5:25 p.m., house manager Thomika Taylor arrived at the Bessemer Group Home.

55.     After distributing weekly allowance money to the residents, Ms. Taylor identified that Mr. Bachemin's left arm was glossy with redness. After speaking with the on-call nurse, she discovered that Mr. Bachemin's stomach was red and blistering upon closer inspection.

56.     After speaking with the on-call nurse, Ms. Taylor examined Mr. Bachemin's legs and genitals and discovered that they were red, burned, and that Mr. Bachemin was missing skin.

57.     Mr. Bachemin was taken to the hospital, where it was discovered that 18% of his body surface area was burned, including his anterior torso, bilateral thighs, bilateral hands, arms, and genitals. Mr. Bachemin had a mix of second- and third-degree burns.

58.     Mr. Bachemin's burns were so severe that he had to undergo excision and grafting of his anterior torso, bilateral thighs, and hands.

59.     Mr. Bachemin was hospitalized for over a month and was not discharged until September 13, 2021.

60.     During the hospitalization, it was discovered that Mr. Bachemin was suffering from pica—a condition where an individual ingests inedible objects.

61.     It was discovered at the hospital that Mr. Bachemin had ingested a wrench, a nail, zippers, a bolt, and other miscellaneous items.

62.     The doctors decided not to perform surgery at that time related to the ingested items.

63.     Upon information and belief, these items were ingested by Mr. Bachemin at the Bessemer Group Home when he was unsupervised.

64.     At no time during the above-described incidents was Mr. Bachemin properly supervised.

65.     At no time during the above-described incidents was Mr. Bachemin's Individual Support Plan properly developed and implemented.

66.     These items are still in Mr. Bachemin's stomach and are still the cause of pain as Mr. Bachemin visited the hospital due to this pain as recently as June of 2022.

67.     After Mr. Bachemin was taken to the hospital, on August 12, 2021, Roukayatou Ousseyni, a program administrator employed by Defendants, performed an internal investigation.

68.     Defendants' internal investigation revealed systemic failure to follow safety and supervision policies at the Bessemer Group Home, which naturally endangered individuals with disabilities.

69.     On or about August 12, 2021, Jessica McMillian, a direct care staff member, was interviewed. Ms. McMillian worked the overnight shift on August 10, 2021.

9

70.     Ms. McMillian was questioned about the water temperature logs. Ms. McMillian denied knowledge of a water temperature log.

71.     When Ms. McMillian was asked whether she monitors clients in the bath, she stated that she did not need to do so because clients are capable of "doing it on their own."

72.     Thus, Ms. McMillian was operating directly in contravention of Defendants' policies related to assessing water temperature, recording water temperature, and supervising and monitoring residents during bathing.

73.     Ms. Yvonne Hensley was a direct care staff employed by Defendants and she worked at the Bessemer Group Home.

74.     Ms. Hensley was working at the Bessemer Group Home on August 11, 2021, and left at approximately 2:50 p.m. on August 11, 2021.

75.     Per her post incident interview, Ms. Hensley claims that she did not see any burns on Mr. Bachemin at the time she left the Bessemer Group Home.

76.     When Ms. Hensley was asked what the protocol was concerning water temperature, she said that "the water doesn't get that hot at all," that she uses "her finger" to check the water temperature, and that she will ask the resident to check with their finger to make sure the water is comfortable.

77.     Ms. Hensley acknowledged that she was aware of the Bessemer Group Home having a thermometer, but she did not know what happened to it or where it could be located.

78.     Based on her post-incident interview, it is clear that Ms. Hensley was not checking the water temperature for residents using a thermometer and, instead, was either performing a rudimentary check herself or was depending on the resident with a disability to assess the water temperature.

79.     Thus, Ms. Hensley was operating directly in contravention of Defendants' policies related to assessing water temperature and recording water temperature.

80.     Mr. Cameron Diggs was a direct care staff employed by Defendants and he worked at the Bessemer Group Home.

10

81.     Mr. Diggs had little or no education or skills that qualified him to work with individuals with severe intellectual disabilities.

82.     Upon information and belief, Mr. Diggs arrived at the Bessemer Group Home on August 11, 2021, at approximately 2:00 p.m.

83.     Based on the post-incident interview, Mr. Bachemin asked for soap, and Mr. Diggs gave Mr. Bachemin soap. Mr. Diggs then left Mr. Bachemin to take a bath, unsupervised.

84.     Mr. Diggs claims that he twice went upstairs and "checked on" Mr. Bachemin

85.     During his post-incident interview, Mr. Diggs admitted that he did not the check water temperature for residents.

86.     During the post-incident interview, Mr. Diggs admitted that he knew where the thermometer was in the Bessemer Group Home, but he did not use it.

87.     During the post-incident interview, Mr. Diggs admitted that he was unfamiliar with the water temperature log and that he did not complete it as required.

88.     Based on his post-incident interview, Mr. Diggs was operating directly in contravention of Defendants' policies related to assessing water temperature, recording water temperature, and supervising and monitoring residents during bathing.

89.     Mr. Diggs was not qualified to work with individuals with disabilities and should never have been hired by Defendants. The extent of Mr. Diggs' lack of qualifications is exemplified by his criminal conduct. Less than two months after the injury to Mr. Bachemin was discovered, Mr. Diggs was arrested and charged with being a fugitive from the law and attempted armed robbery.

90.     After the injury to Mr. Bachemin, Disability Rights Louisiana investigated the treatment of Mr. Bachemin and Defendants' policies and practices at the Bessemer Group Home.

91.     Pursuant to the Protection and Advocacy for Individuals with Mental Illness Act, the Developmental Disabilities Assistance and Bill of Rights Act of 2000, and the Protection and Advocacy of Individual Rights Program, Disability Rights Louisiana has federally mandated authority to investigate allegations of abuse and neglect of individuals with disabilities in facilities

11

and programs, including group homes. Included within this authority is the right to access documents related to an individual, relevant records, and relevant policies. A responding entity is obligated to comply with requests for this information.

92.     In accordance with its federally authorized authority, Disability Rights Louisiana demanded that Defendants produce any and all records related to documenting or monitoring water temperature and water heater(s), including but not limited to logs and forms from January 2021 – March 14, 2022 for the Bessemer Group Home. Defendants produced various documents but failed to produce any water temperature logs from August of 2021. In fact, Defendants failed to produce any water temperature logs for the entire year of 2021.

93.     Upon information and belief, Defendants failed to produce any such logs because Defendants' staff were not checking the water temperature for residents and therefore were certainly not recording this failure. This conclusion is bolstered by the fact that multiple staff members conceded that they were not checking and recording the water temperature.

94.     In response to the injury to Mr. Bachemin, Defendants decided to take "corrective action," including monitoring "all clients at all times, & making sure all staff knows the whereabouts of all clients." Additionally, a plan for future corrective action was developed, which was "To monitor all clients at all times. All staff will be re trained on the supervision of all clients."

95.     The above corrective actions demonstrate that, before Mr. Bachemin was injured, it would have been feasible for Defendants to monitor residents, to know the whereabouts of all residents, and for the staff to be trained on the supervision of clients.

96.     In response to the injury to Mr. Bachemin and the internal investigation, Ms. Ousseyni listed the following recommendations from the investigative team: 1) "Staff receives training on monitoring clients during bath time and checking and recording water temperature according to facility's Policies and Procedures [and] [i]mmediately reporting water temperature exceeding that specified in policy"; 2) "Client M.B's BSP be updated for PICA and staff trained"; and 3) "Maintenance staff should also monitor water heater temperature valves quarterly."

97.     The above recommendations demonstrate that, before Mr. Bachemin was injured, it would have been feasible for Defendants to ensure that its staff were trained on monitoring clients during bath time, checking and recording water temperature according to their policies and procedures, immediately reporting water temperature exceeding that specified in policy, and monitoring water heater temperature valves regularly.

98.     The internal investigation included the following comment by Ms. Ousseyni: "During M.B.'s hospital stay, it was discovered that he had PICA. There were some construction/repairs completed at the home which could explain the object discovered in his abdominal x-ray."

99.     Upon information and belief, while unsupervised, Mr. Bachemin was able to enter the area where the construction equipment was, obtain a wrench and/or other inedible objects, and swallow the wrench and/or other inedible objects.

100.     Upon learning about Mr. Bachemin's horrific injuries, on or about August 16, 2021, a meeting occurred with the following participants: Anna Bachemin (Mr. Bachemin's mother), Christine Holmes (Mr. Bachemin's sister), Derrick Holmes (Mr. Bachemin's brother-in-law), Lillian Johnson (Qualified Intellectual Disability Professional or QIDP), Roukayatou Ousseyni (DDMS Administrator), Eldwyn Harvey (Nurse), Thomika Taylor (Bessemer Group Home Manager), and Jeannie Doiron (Disability Rights Louisiana Ombudsman).

101.     The purpose of the meeting was for Mr. Bachemin's family to obtain answers as to how Mr. Bachemin was horribly injured in Defendants' care and custody. During the meeting, Defendants' facility administrator was evasive, attempted to blame other residents, and attempted to blame Mr. Bachemin, despite knowing about Mr. Bachemin's disability.

102.     Unbeknownst to Mr. Bachemin's family, Defendants already knew that several of their staff members had admitted to not following the Water Policy. Defendants did not admit that their staff members had been operating in violation of the Water Policy.

103.     Defendants' staff did not apologize for causing Mr. Bachemin harm, did not offer to reimburse Plaintiff for the harm caused to Mr. Bachemin, and made no attempt to "make the situation right." Instead, Defendants' staff were evasive and avoided responsibility.

104.     The above-described incidents do not ordinarily occur in the absence of negligence. Given the extent of Mr. Bachemin's disability, no other responsible causes including the conduct of Mr. Bachemin and third persons can explain the incident or the injuries that occurred as a result. The indicated negligence is within the scope of Defendants' duty to Mr. Bachemin.

## COUNT I: NEGLIGENCE

105.     Defendants had a duty to ensure that individuals with disabilities were vigilantly supervised while at the Bessemer Group Home.

106.     Defendants had a duty to train their staff on the Water Policy and Mixing Valves Policy and ensure that these policies were being followed.

107.     Defendants' staff had an obligation to follow the Water Policy and the Mixing Valves Policy.

108.     Defendants had a duty to ensure that the water in the bath, in the shower, and in the sinks did not get hot to the point that residents could get burned.

109.     Defendants had a duty to check the settings on the hot water tank and its mixing valve(s) and ensure that the water in the bath, in the shower, and in the sinks did not get hot to the point that residents could get burned.

110.     Defendants had a duty to ensure that any cooking or food preparation areas or devices were secured such that residents with disabilities could not be injured through their use or through misuse by another resident.

111.     Defendants had a duty to ensure that residents were regularly assessed by a house manager to ensure that their unexpressed needs were being met.

112.     Defendants had a duty to ensure that residents were not provided with access to dangerous objects, that residents did not bring in dangerous objects, and that employees and staff of the Bessemer Group Home did not bring in dangerous objects.

113.    Defendants had a duty to ensure that its staff were trained on how to provide for the needs of individuals with disabilities and provide for their safety.

114.    Defendants had a duty to ensure that the staff it hired was sufficiently qualified to perform their duties.

115.    As is stated above, Mr. Bachemin is incapable of caring for himself and, thus, was placed at the Bessemer Group Home to ensure that his safety and needs would be accommodated. Unfortunately, Mr. Bachemin's safety and needs were not provided for at the Bessemer Group Home.

116.    Upon information and belief, the burns to Mr. Bachemin were caused by excessively hot water in the bath or shower.

117.    In the alternative, even if the burns to Mr. Bachemin were caused by another source—excessively hot water from the sink or cooking area or a flammable object such as a lighter or candle—Defendants, through their staff, had a duty to supervise Mr. Bachemin, to check the water temperature, to not permit water to be heated on the stove, and to confiscate all flammable objects such as lighters and candles.

118.    Regardless of the precise mechanism of Mr. Bachemin's injury, the cause of that injury was Defendants' neglect, failure to supervise, failure to provide a safe environment, failure to train staff, and failure to hire competent staff.

119.    While at the Bessemer Group Home, Defendants breached one or more of their duties to Mr. Bachemin.

120.    Defendants breached their duty to supervise Mr. Bachemin as he was left alone in the tub.

121.    Defendants breached their duty to check the water temperature for Mr. Bachemin.

122.    Defendants breached their duty to record water temperatures.

123.    Defendants breached their duty to ensure that their staff were trained on Defendants' policies and procedures.

124.    Defendants breached their duty to ensure that their staff were regularly following Defendants' policies and procedures.

125.    Defendants breached their duty to supervise Mr. Bachemin and ensure that he did not procure dangerous objects.

126.    Defendants breached their duty to supervise Mr. Bachemin and ensure that he not swallow dangerous objects he procured at the Bessemer Group Home.

127.    Defendants breached their duty to ensure that they hired sufficiently qualified individuals that were willing to follow Defendants' policies and procedures and could work with individuals with intellectual disabilities.

128.    Upon information and belief, Defendants breached their duty to check the settings on the hot water tank and its mixing valve(s).

129.    While at the Bessemer Group Home, as is discussed above, Mr. Bachemin suffered severe and extensive burns to his body. These burns required hospitalization and surgery.

130.    While at the Bessemer Group Home, as is discussed above, Mr. Bachemin swallowed dangerous objects, the ingestion of which was discovered during his hospitalization.

131.    For the reasons set forth above, and as will be shown at trial, Defendants breached their legal duties.

132.    But for Defendants' failure to supervise Mr. Bachemin, failure to take steps necessary to ensure that the environment was safe for individuals with severe intellectual disability and autism, failure to assess Mr. Bachemin, and, upon information and belief, failure to provide the necessary training to its staff, Mr. Bachemin would not have been burned and injured.

133.    Plaintiff invokes the legal doctrine of *res ipsa loquitur*.

134.    At the time of his housing at Bessemer Group Home, Defendant employed various individuals to provide services to residents such as Mr. Bachemin. Plaintiff invokes the legal doctrine of *respondeat superior*. The tortious acts by Defendants' staff occurred during the hours of employed, occurred on the employer's premises, the acts were reasonably incidental to the

performance of their duties, and the acts were primarily employment rooted. Defendants' employees were acting within the course and scope of their employment.

135.    As such, Defendants are vicariously liable for the negligence of their employees or agents at the Bessemer Group Home.

136.    Defendants' breach of their duties caused the injuries that are at issue in this case.

137.    As a result of the negligence of Defendants, Mr. Bachemin suffered, and hereby seeks damages for, personal injury, scarring, pain and suffering, anxiety, past medical bills, future medical care, future pain and suffering, emotional distress and anxiety, and limitations of activities.

138.    Upon information and belief, as a result of the injury, Mr. Bachemin has and continues to suffer from pain and suffering.

139.    The injuries at issue in this case were proximately and legally caused by Defendants and were a foreseeable result of the failure to supervise an individual with severe intellectual disability and autism, failure to provide a safe environment, failure to control and check the water temperature, failure to train staff, and failure to assess Mr. Bachemin in a timely manner.

## COUNT II: THE LOUISIANA HUMAN RIGHTS ACT
### (La. R.S. § 51:2231 et. seq. ("LCHR"))

140.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

141.    At all times relevant to this action, the Louisiana Commission on Human Rights, LA. REV. STAT. ANN. § 51:2231 et. seq., (hereafter "LCHR") has been in full force and effect and has applied the conduct of Defendants.

142.    At all times relevant to this action, Mr. Bachemin has experienced substantial limitations to several major life activities, as discussed above, and has been an individual with a disability within the meaning of LCHR, LA. REV. STAT. ANN. § 51:2232(3)(a).

143.    At all times relevant to this action, Defendants have qualified as a place of public accommodation, resort, or amusement as defined by LA. REV. STAT. ANN. § 51:2232(9) by virtue of either supplying services to the general public, soliciting and accepting the patronage of the general public, or having been supported directly or indirectly by government funds.

144.    The LCHR prohibits discriminatory practices and provides that "it is a discriminatory practice for a person to deny an individual the full and equal enjoyment of goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, resort, or amusement . . . on the grounds of . . . disability." LA. REV. STAT. ANN. § 51:2247.

145.    The LCHR extends relief to "[a]ny person deeming himself injured by" discrimination in violation thereof. LA. REV. STAT. ANN. § 51:2264.

146.    Defendants discriminated against Mr. Bachemin, on the basis of disability, in violation of LA. REV. STAT. ANN. § 51:2247, by failing to adjust to Mr. Bachemin's unique, disability-related needs. Under the circumstances, Mr. Bachemin had a need to be supervised and for his home environment to be made safe by Defendants.

147.    Given the circumstances, and given Mr. Bachemin's severe disability, his need for the above modifications was open, obvious, and readily apparent to Defendants. Additionally, Defendants had an affirmative obligation to ensure that Mr. Bachemin's disability-related needs were being satisfied.

148.    Defendants failed to provide the necessary accommodations / modifications, as is evidenced by the fact that Mr. Bachemin was severely burned while in Defendants' care and custody.

149.    Mr. Bachemin, through Ms. Bachemin, deems himself injured by Defendants' conduct and sues under the LCHR to recover compensatory damages for the injuries and loss he sustained as a result of Defendants' discriminatory conduct. Plaintiff also seeks an award of nominal damages.

150.    Mr. Bachemin is further entitled to an award of attorneys' fees, costs, and disbursements pursuant to the LCHR, LA. REV. STAT. ANN. § 51:2264.

## COUNT III: THE LOUISIANA UNFAIR TRADE PRACTICES ACT

### (La. R.S. § 51:1401 et seq. ("LUTPA"))

151.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

152.    At all times relevant to this action, the Louisiana Unfair Trade Practices Act, LA. REV. STAT. ANN. § 51:1401 et. seq., has been in full force and effect and has applied the conduct of Defendants.

153.    The LUTPA declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" La. R.S. 51:1405(A). Under the LUTPA, the plaintiff must establish that there has been some element of fraud, misrepresentation, deception, or other unethical conduct on the part of the defendant.

154.    As is set forth above, Defendants hold themselves out to the public as "advocates," *i.e.*, individuals who "assist people with making sure their rights are respected" and ensure that their residents' "concerns or issues" are resolved.

155.    Far from being medical doctors, psychologists, psychiatrists, educators, or individuals with professional education on individuals with disabilities—backgrounds that would equip Defendants' senior management and executives to be "advocates"—Defendants' senior management are primarily (if not exclusively) accountants.

156.    The dearth of relevant educational background by Defendants' senior management appears to have a "trickle down" effect. Far from anyone "advocating" for Mr. Bachemin at the Bessemer Group Home, Mr. Bachemin was neglected, unsupervised, and permitted to live in an unsafe environment.

157.    As a result of this neglect, unsafe environment, and lack of supervision, Mr. Bachemin experienced severe burns to his body, personal injury, and ingestion of inanimate objects.

158.    Thus, Defendants appears to be engaged in a "bait and switch": On the one hand, Defendants claim that residents in their care will be safe, and that Defendants will "advocate" for

their needs. In reality, however, as Mr. Bachemin tragically experienced, residents of the Bessemer Group Home were neglected, unsupervised, and permitted to live in an unsafe environment.

159.    Indeed, one of Defendants' employees—Mr. Diggs—was supposed to be supervising Mr. Bachemin while he was in the tub and to check his bath water. Mr. Diggs failed to perform this supervision and water temperature check and, shortly thereafter, Mr. Bachemin was discovered to have severe burns across his body.

160.    The extent of Mr. Diggs' lack of qualification is exemplified by his criminal conduct. Less than two months after the injury to Mr. Bachemin was discovered, Mr. Diggs was arrested and charged with being a fugitive from the law and attempted armed robbery.

161.    By publicly stating that one type of service would be provided—a safe environment where Defendants would "advocate" for the needs of its residents—and by providing a completely different environment, and by having management that lacked formal education in germane subject areas, Defendants created an expectation of security and safety for residents with disabilities that was illusory.

162.    As a result of Defendants' conduct, at least one individual with a disability, Mr. Bachemin, was injured.

163.    To the extent discovery reveals that other individuals with disabilities have been injured at Defendants' facilities, this would further exacerbate a finding that Defendants have engaged in misrepresentation, deception, or unethical conduct.

164.    By creating an illusion of safety and security, and by instead neglecting Mr. Bachemin, Defendants caused injury to Mr. Bachemin and thereby engaged in misrepresentation, deception, or unethical conduct.

## DAMAGES SOUGHT

165.    By and through their conduct, Defendants caused significant damages and injuries to Mr. Bachemin. Plaintiff seeks to recover the following damages:

    a.    Physical bodily injury suffered by Mr. Bachemin;

20

   b.   Scarring to Mr. Bachemin's skin;

   c.   Pain and suffering attendant to the physical bodily injuries suffered by Mr. Bachemin;

   d.   Emotional distress, anxiety, and distress;

   e.   Damages for Mr. Bachemin's incurred medical care;

   f.   Damages for the discrimination related injuries suffered by Mr. Bachemin;

   g.   Damages for Mr. Bachemin's future medical care;

   h.   Damages for Mr. Bachemin's past and future pharmacy costs;

   i.   Nominal damages under the LCHR to vindicate Mr. Bachemin's civil rights;

   j.   Legal interest on all of the above; and

   k.   All other damages that are available at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

   A.   This Court award compensatory or actual damages, legal interest, and costs against Defendants for negligence, violation of the LCHR, and LUTPA;

   B.   Nominal damages under the LCHR to vindicate Plaintiff's civil rights;

   C.   Attorneys' fees and costs (including expert expenses) under the LCHR and LUTPA; and

   D.   Such other relief as the Court deems just and proper, and/or is allowable under the law.


Respectfully Submitted,

**BIZER & DeREUS, LLC**
*Attorneys for Plaintiff*

/s/ Andrew D. Bizer
ANDREW D. BIZER (LA # 30396)
GARRET S. DeREUS (LA # 35105)
EMILY A. WESTERMEIER (LA # 36294)
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996
Email: ewest@bizerlaw.com
        andrew@bizerlaw.com
        gdereus@bizerlaw.com


***AND***

**Disability Rights Louisiana**
*Attorneys for Plaintiff*

/s/ Evelyn Chuang
EVELYN CHUANG (LA #38993)
MELANIE A. BRAY (LA #37049)
8325 Oak Street,
New Orleans, LA 70118
T: (504) 522-2337; F: (504) 272-2531
echuang@disabilityrightsla.org
mbray@disabilityrightsla.org