### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**MICHAEL BACHEMIN, BY AND THROUGH**            **CIVIL ACTION**
**TUTRIX AND NEXT FRIEND ANNA**
**BACHEMIN**

**VERSUS**                                     **NO:   22-1976**

**DDMS, LLC, ET AL.**                      **SECTION: "P" (4)**

### ORDER

Before the Court are two motions. The first is a **Motion to Enlarge Number of Permitted Depositions (R. Doc. 43)**, filed by Plaintiff, Michael Bachemin ("Plaintiff"). The motion is opposed (R. Doc. 51). The second is a **Motion to Quash and/or for Protective Order (R. Doc. 45)** filed by the Defendants. [1] The motion is opposed (R. Doc. 48). The Motions were heard together on June 28, 2023.

### I. Background

This diversity action arises out of the alleged injury, neglect, abuse, and disability-related discrimination of Michael Bachemin. Plaintiff allegedly has been diagnosed with multiple disabilities including severe intellectual disability, autism, impulse order control, and unspecified psychosis. Compl. ¶ 24, R. Doc. 1. Plaintiff was a resident of the Bessemer Group Home ("Bessemer" or "Bessemer Group Home"), which was owned by Defendants. *Id.* ¶ 2.

Plaintiff claims that on August 11, 2021, around 5:00 p.m., the house manager, Thomika Taylor, discovered that his left arm was red and glossy. *Id.* ¶ 54-55. After Ms. Taylor spoke via telephone with the on-call nurse, he claims that Ms. Taylor examined

---

[1] The Defendants are DDMS, LLC; DDMS of Louisiana, LLC; DDMS of Louisiana No. 2, LLC; DDMS of Louisiana No. 3, LLC; and DDMS Operations, LLC (collectively, "Defendants"). Plaintiff alleges Defendants own or operate the Bessemer Group Home in Kenner, Louisiana. *See* Compl. ¶ 7.

his legs and genitals and discovered that they were red, burned, and that he was missing skin. *Id.* ¶ 56. Plaintiff alleges that he was then taken to the hospital where it was discovered that he sustained second- and third-degree burns over 18% of his body, including his anterior torso, bilateral thighs, bilateral hands, arms, and genitals. *Id.* ¶ 57. Plaintiff alleges that his burns were so severe that he underwent excision and grafting of his anterior torso, bilateral thighs, and hands, and was hospitalized for over one month. *Id.* ¶¶ 58-59. He was not discharged until September 13, 2021.  *Id.* ¶ 59.

Plaintiff also claims that during his hospitalization, it was discovered that he was suffering from pica—a condition where an individual ingests inedible objects.  *Id.* ¶ 60. It was also discovered at the hospital that he had ingested a wrench, a nail, zippers, a bolt, and other miscellaneous items. *Id.* ¶ 61. Plaintiff alleges that he was allowed to swallow dangerous and inedible objects while he was at Bessemer because he was unsupervised. *Id.* ¶¶ 63-64.

As a result of his injuries, Plaintiff contends that the Defendants should be held liable to him because of their failure to supervise and train their employees, *res ipsa loquitor*, and their failure to follow the water temperature policies. *Id.*  ¶¶ 106-107; ¶¶ 123-24, ¶ 133. It is alleged that the failure to confirm the water temperature before allowing Plaintiff to enter the shower or bath caused his burns. *Id.* ¶ 116.

Plaintiff also alleges that Defendants violated the Louisiana Unfair Trade Practices Act, La. R.S. § 51:1401(A) ("LUTPA") by misrepresenting themselves as advocates when their senior management have degrees in accounting and business management. *Id*.  ¶¶ 151-56. Finally, Plaintiff alleges that Defendants violated the

Louisiana Human Rights Act, La. R.S. § 51:2247 ("LCHR") by failing to accommodate his open and obvious need for supervision and a safe home environment. *Id*. ¶¶ 144-48.

At this time, Plaintiff avers that he has taken seven depositions. Pl.'s Mem. 4, R. Doc. 43-1. He now seeks to enlarge the number of depositions beyond the ten permitted by Federal Rule of Civil Procedure 30. In support, Plaintiff offers a declaration of his counsel attesting that the parties disagree about Plaintiff's need to exceed the number of permitted depositions. Dereus Decl. ¶¶ 3-5, R. Doc. 43-3. The declaration also describes the parties' disagreement about deposing executives Mr. Wayne Addison and Mr. Terry Swatley. *Id*.

Defendants oppose the motion to enlarge depositions and contend that Plaintiff has failed to establish the need for more than ten depositions. R. Doc. 51. To aid in the evaluation of whether Plaintiff's seven depositions were necessary, the Defendants provided four deposition transcripts for the Court's review. *See* R. Docs. 51-1 to 51-4.

Defendants have also moved to quash the unilaterally noticed depositions of executives Mr. Addison and Mr. Swatley, or, in the alternative, seek entry of a protective order prohibiting the depositions. Defs.' Opp'n, R. Doc. 45-1. Defendants argue that the existing deposition testimony does not indicate that the executives participated in day-to-day decision-making at the Bessemer Group Home. *Id*. at 2. Defendants also seek an award of reasonable attorneys' fees because Plaintiff fails to meet the apex standard.

Plaintiff argues that the executives possess relevant, discoverable information and should therefore be deposed. R. Doc. 48.

II.    <u>**Standard of Review**</u>

Rule 26(b)(1) sets the scope of discovery to include "any non-privileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). The Rule further specifies that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." *Id.* That discovery rules are accorded broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials is well established. *Herbert v. Lando*, 441 U.S. 153, 177 (1979). Nevertheless, the discovery provisions are subject to the command of Federal Rule of Civil Procedure 1 that they "be construed to secure the just, speedy, and inexpensive determination of every action." *Id.* (quoting FED. R. CIV. P. 1). To that end, "the requirement of Rule 26(b)(1) that material sought be 'relevant' should be firmly applied." *Id.* The "control of discovery is committed to the sound discretion of the trial court." *Freeman v. United States*, 556 F.3d 326, 341 (5th Cir. 2009).

Under Rule 26(b)(2)(C), discovery may be limited if: (1) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from another, more convenient, less burdensome, or less expensive source; (2) the party seeking discovery has had ample opportunity to obtain the discovery sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit. *Id.* In assessing whether the burden of the discovery outweighs its benefit, a court must consider: (1) the needs of the case; (2) the amount in controversy; (3) the parties' resources; (4) the importance of the issues at stake in the litigation; and (5) the importance of the proposed discovery in resolving the issues. FED. R. CIV. P 26(b)(2)(C)(iii).

Rule 26(c) allows the court to issue a protective order after a showing of good cause "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1). Rule 26(c)'s "good cause" requirement indicates that the party seeking a protective order has the burden "to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (quoting *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)). The trial court enjoys wide discretion in setting the parameters of a protective order. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984) ("To be sure, Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."). Finally, Rule 26(c)(1) requires a certification that the moving party has conferred or attempted to confer in good faith with the other affected party to attempt to resolve the issue without the court's interference.

## III.  <u>Analysis</u>

Plaintiff contends that he has taken seven (7) depositions in the case. Plaintiff, however, did not provide any transcripts of the depositions. Instead, the only evidence offered by Plaintiff is his counsel's declaration.

Plaintiff now seeks to take additional depositions of Derrik, a maintenance employee; Ms. Kia Griffin, an investigator tasked by Defendants to investigate the incident involving Plaintiff; Ms. Thomika Taylor, house manager at Bessemer Group Home; and Ms. Ousseyni's supervisor. R. Doc. 43-1 at 9, 13-14. Plaintiff also seeks to depose a member of the Louisiana Department of Health, at least one to three hospital or staff physicians, and Defendants' experts. *Id.* at 15. Finally, Plaintiff seeks to depose Mr.

Terry Swatley, Defendants' Chief Executive Officer, and Mr. Wayne Addison, Defendants' President. *Id.* at 10-13.

In opposition, Defendants contend that Plaintiff cannot carry his burden to demonstrate the need for depositions in excess of Federal Rule of Civil Procedure 30, which limits the number of depositions to ten. Specifically, Defendants contend that the depositions of Mary O'Connor Eugene,[2] Yvonne Hensley, and Eldwyn Antoine Harvey were unnecessary. The Defendants contend that Ms. O'Connor Eugene had no knowledge about the case, that Ms. Hensley testified that she knew of the water temperature procedures and followed them, and that Mr. Harvey was not at the Group Home but learned of Plaintiff's burns by FaceTime. Therefore, Defendants, contend, these three depositions were unnecessary. The Defendants further deny that there is any testimony that supports Plaintiff's suggestion that DDMS leadership was absent as represented by Plaintiff. The Defendants also suggest that Plaintiff mischaracterized the testimony of Lillie Johnson and Jessica McMillian.[3]

Federal Rule of Civil Procedure 30 allows each side in a lawsuit to take ten depositions. FED. R. CIV. P. 30(a)(2)(i). Under Rule 26(b)(2)(a), the Court may "alter the limits in these rules on the number of depositions." *Egana v. Blair's Bail Bonds, Inc.*, No. 17-5899, 2019 WL 8277616, at *1 (E.D. La. Jan. 23, 2019) (quoting *United States v. RES Holdings*, No. 11-739, 2012 WL 4369658, at *2 (E.D. La. Sept. 24, 2012)). To decide whether to adjust the allotted number of depositions, courts look to Rules 26(b)(1) and (2). Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-

---

[2] The Court notes that Ms. O'Connor Eugene had recently changed her name, from Mary O'Connor to Mary O'Connor Eugene, when the deposition was taken on May 3, 2023. Eugene Dep. 5, R. Doc. 51-1. Ms. Eugene went by Mary O'Connor during the events of August 2021. *Id.*

[3] The deposition transcript of Ms. McMillian was not provided to the Court for review.

privileged matter that is relevant to any party's claim or defense" and specifies that discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1).

A party who seeks leave to take more than ten depositions must also show, pursuant to Rule 26(b)(2)(C), "why each of the requested depositions concerns an issue material to the case and why each deposition is not unreasonably cumulative or duplicative . . . ." *Egana*, 2019 WL 8277616, at *1 (quoting *American Electric Power Co. v. Affiliated FM Insurance Co.*, No. 02-1133, 2005 WL 8155306, at *3 (M.D. La. June 21, 2005)); *see also Barrow v. Greenville Independent School District*, 202 F.R.D. 480, 483-84 (N.D. Tex. 2001 Sept. 18, 2001) (denying request for additional depositions when a party failed to show that depositions would not reveal anything other than what was already obtained). In addition to a particularized need for the requested discovery, the movant must justify the necessity of the depositions already taken in the case. *DeGraw v. Gualtieri*, No. 18-cv-2116, 2019 WL 5423317, at *4 (M.D. Fla. Oct. 23, 2019) (citation omitted).

Courts allow parties to exceed the ten-deposition limit when a party identifies the proposed deponent, demonstrates that the proposed deponent is likely to possess relevant information, and the depositions represent the only feasible method for obtaining the information. *Talismanic Properties, LLC v. Tipp City, Ohio*, 309 F. Supp. 3d 488, 498 (S.D. Ohio Mar. 7, 2017) (denying additional depositions where plaintiffs failed to state

with particularity the proposed deponents); *Scott v. City of Sioux City, Iowa*, 298 F.R.D. 400, 402 (N.D. Iowa Feb. 11, 2014) (permitting deposition when proposed deponents are ethically "off limits" to plaintiff's counsel due to their existing employment with the defendant city); *Madison v. Jack Link Associates Stage Lighting & Productions, Inc.*, 297 F.R.D. 532, 537 (S.D. Fla. Dec. 17, 2013) (permitting additional deposition where contractor could not obtain the information sought through other means of discovery). However, "the mere fact that more than ten persons may have discoverable information does not mean that taking more than ten depositions makes sense." *Talismanic Propertie*s, 309 F. Supp. 3d at 498.

### A.   Prior Depositions

To date, Plaintiff states that he has taken seven depositions. Six occurred between May 3-4, 2023, and one occurred on May 30, 2023.[4] Plaintiff claims that each of the deposition witnesses provided valuable information.

Defendants allege Plaintiff has failed to show that each deposition was necessary, and that if Plaintiff had not taken three of the unnecessary depositions, Plaintiff would have six remaining depositions. For this reason, Defendants argue, Plaintiff's motion to enlarge the number of permitted depositions should be denied.

---

[4] The depositions that have been taken include Mary O'Connor Eugene (an LPN who provided case management services to Defendants and was assigned to investigate the incident involving Plaintiff); Yvonne Hensley (Defendants' direct care staffer); Jessica McMillan (Defendants' direct care staffer); Eldwyn Harvey (the nurse who first examined Plaintiff via FaceTime); Roukayatou Ousseyni (Defendants' program administrator in New Orleans); and Lillie Johnson (Defendants' Qualified Developmental Disability Professional). Pl.'s Mem. in Support at 4, R. Doc. 43-1.

Additionally, on May 30, 2023, Plaintiff's counsel deposed Mr. Cam'Ron Diggs, the last employee to see Plaintiff without burns and observed him getting into the bath. *Id*. at 5. Plaintiff did not provide the deposition of Mr. Diggs for review.

Four depositions were provided for the Court's review by the Defendants. The depositions are Mary O'Connor Eugene, Yvonne Hensley, Eldwyn Harvey, and Lillie Johnson.

### 1. Mary O'Connor Eugene

Plaintiff claims that Ms. O'Connor Eugene's testimony concerning her assignment to assist with the investigation of Plaintiff's injury is valuable. Plaintiff contends that other than making a phone call, Ms. O'Connor Eugene did not take any steps to investigate what happened to Plaintiff. This, Plaintiff claims, is "highly relevant" because it explains the "holes in the narrative due to Ms. O'Connor's [sic] apathetic approach to the investigation." R. Doc. 43-1 at 4.

Defendants contend that Ms. O'Connor Eugene's testimony was "entirely unnecessary" because she had no knowledge about Plaintiff's case. R. Doc. 51 at 4. Defendants, however, acknowledge her initial assignment to investigate the case. *Id.*

Ms. O'Connor Eugene testified that she is a licensed practical nurse ("LPN"). Eugene Dep. 7, R. Doc. 51-1. In her capacity as an LPN working for the Defendants ,she testified that she provided "[c]ase management for all of the clients." *Id.* at 7-8. She further testified that her work consisted of "handl[ing] all of their medical care, ma[king] sure they went on their appointments, [and] mak[ing] sure that there was someone to pass their meds." *Id.* at 8.

Ms. O'Connor Eugene further testified that she was not assigned to provide services to the Group Home where Plaintiff was residing. *Id.* at 10. She also stated that for the homes to which she was assigned, she visited each home a minimum of once per week. *Id.* at 11. She also testified that she would see Plaintiff when he would come to the

day program. *Id.* at 12. She denied ever providing services to him when he was at the day program, and she did not remember him actually attending the day program. *Id.* at 13-14. She testified she had no interactions with the Bessemer Group Home in 2021. *Id.* at 14.

Ms. O'Connor Eugene also testified that she first learned of Plaintiff's injury from his nurse at the Bessemer Group Home, Mr. Eldwyn Harvey, but she did not recall whether Mr. Harvey called her or if they spoke in person. *Id.* at 15-16. She testified that her only involvement in the investigation of Plaintiff's injury was making a note even though she was asked to "participate" in the investigation. *Id.* at 16-17. She testified that even though she wrote in the case note that she would continue to monitor the matter, she did not. *Id.* at 18. She also admitted that she was assigned by her supervisor, Roukayatou Ousseyni, to investigate the matter. *Id.* at 19. She indicated that she did not have meetings or discussions with her supervisor or Ms. Kia Griffin, who were both assigned to the investigation. *Id.* at 20. According to Ms. O'Connor Eugene, she did not have discussions concerning her role in the investigation, did not follow up to see what was needed from her in order to participate in the investigation, and did not send any emails asking how she could help in the investigation. *Id.* at 20.

The Court finds that Ms. O'Connor Eugene's testimony is merely an after-the-fact witness. At best, she was asked to participate in the investigation, but there is no claim as to Defendants' negligent investigation. Further, she did not work at Bessemer, where Plaintiff resided. Therefore, her testimony is not proportional to the needs of this case.

2. Yvonne Hensley

As to Ms. Hensley, Plaintiff claims that her testimony was "invaluable." R. Doc. 43-1 at 4. Plaintiff contends that Ms. Hensley "admitted that she was untrained" and did

not know how to locate the facility's policies or procedure manuals. *Id.* Plaintiff indicates that Ms. Hensley testified that she "did not know the policies related to bathing." *Id.* Plaintiff also asserts that Ms. Hensley's testimony was necessary because it shows that the Bessemer Group Home was short staffed when Plaintiff was injured, and that Mr. Diggs, a direct care staffer, admitted he believed he was insufficiently trained. *Id.*

The Defendants contend that Ms. Hensley's opinion about the level of training that she or another employee received is inadmissible. R. Doc. 51 at 2. As a fact witness, Defendants argue that Ms. Hensley cannot give expert testimony about the requisite level of training for those positions. *Id.* at 3. Regarding Ms. Hensley's knowledge about the water policies, Defendants argue that when specifically asked about checking the water temperature and logging it, Ms. Hensley testified that she was instructed to follow certain procedures. *Id.* As a result, Defendants assert Ms. Hensley's deposition was unnecessary.

Ms. Hensley testified that she was hired as a vocational instructor at Progressive Health before the company transitioned to DDMS. Hensley Dep. 6-7, R. Doc. 48-6. As a vocational instructor, she taught clients how to read, write, and do math. *Id.* at 6. She indicated that at DDMS, she had been trained in CPR, took a medication class, and learned about the fire drill. *Id.* at 9. She testified that she was also trained on abuse and neglect. *Id.* Ms. Hensley indicated that she had been trained on health and safety "stuff," was tested on a tablet after the training, and that it occurred once per year. *Id.* at 11.

Ms. Hensley also stated that before the pandemic, she had been working at the day program, and that around March of 2020, she was transferred to work in Bessemer Group Home because there was a staffing shortage. [5] *Id.* at 14-15. Ms. Hensley indicated

---

[5] The Court notes that Ms. Hensley's later testimony indicates that she returned to the day program in March 2023. Hensley Dep. 57. This indicates that she would have been assigned to Bessemer in March

that she was at Bessemer Group Home the entire time. *Id.* at 18. While she was working at Bessemer, Ms. Hensley testified that she was instructed to do different work from before, including cleaning the house, ensuring "the guys make their beds, make sure they wash their clothing, and serve their lunch, and give them their medication." *Id.* at 15-16. Ms. Hensley denied that she received training on the Water Policy when she worked at Bessemer during COVID. *Id.* at 67.

Ms. Hensley also indicated that she performed her tasks according to a checklist that was provided, and that the checklist included checking the water temperature each morning and logging it in the water log. *Id.* at 19-20. She testified that she checked the temperature each morning and logged it. *Id.* at 20.

Ms. Hensley testified that she worked from 7:30 a.m. to 3:30 p.m. Monday through Friday. *Id.* at 19. She also stated that she had only bathed Plaintiff once because staffers working the 2:00 p.m. to 10:00 p.m. shift are responsible for bathing him. *Id.* at 48. On the one occasion that she did bathe Plaintiff, Ms. Hensley testified that he took a shower that day. *Id.* at 45. She also testified that she checked the water temperature before his shower because Plaintiff does not "know better about hot and cold," and she wanted to make sure the water wasn't hot. *Id.* at 76-77. She acknowledged that she tested the water because there are logs on the wall where "they test the water before they use it." *Id.* at 77. Ms. Hensley also acknowledged that she was instructed to fill in the log. *Id.*

Ms. Hensley denied seeing Plaintiff "hurt." *Id.* at 72. However, she acknowledged that she heard he had been injured. *Id.*

---

2021. However, whether Ms. Hensley began work in March 2020 or in March 2021 is not of concern because she was assigned to work at Bessemer when Mr. Bachemin sustained his injuries in August 2021.

When shown a copy of the "DDMS Emergency & Safety Policy and Procedure Book," Ms. Hensley testified that she was not aware of it and had not seen it until that day. *Id.* at 12. She also testified that she did not have access to the book, that no one told her how to access it, and that no one told her she needed to be following it. *Id.* at 13. As a result, she testified she did not know the requirements in the "DDMS Emergency & Safety Policy and Procedure Book." *Id.*

Ms. Hensley also testified that an individual named Patrick Lanier, a resident at Bessemer, talked to another resident, Anthony Gonzales. *Id.* at 42. According to Ms. Hensley, Patrick stated, "It's a shame what I did [to] [Plaintiff]." *Id.* She also stated that the woman who worked the night shift at Bessemer said that Patrick would stay up all night and walk around. *Id.* at 43. Ms. Hensley stated that Patrick would often fabricate stories and that she did not consider him to be reliable. *Id.* at 80.

The Court finds that Ms. Hensley's testimony was necessary because she worked at the Bessemer Group Home during the operative time. Additionally, her testimony raises the specter of potential alternative explanations for the cause of Plaintiff's injuries. The cause of injury is directly relevant to Plaintiff's negligence claim. Furthermore, the issue of whether Bessemer staff members were properly trained on bathing procedures, including the Water Policy and Mixing Valves Policy, is material to Plaintiff's negligence claim, although Ms. Hensley testified that she did test the water temperature and entered the temperature in the water log. Therefore, the Court finds that the deposition of Ms. Hensley was relevant and proportional to the case.

### 3. <u>Mr. Eldwyn Harvey</u>

Plaintiff asserts that Mr. Eldwyn Harvey's testimony confirmed his injuries and timeline those injuries occurred. R. Doc. 43-1 at 5. Additionally, Mr. Harvey did not testify to any facts that would suggest Plaintiff's burns were caused by a physical fire rather than hot water. *Id.*

The Defendants argue that Mr. Harvey was not present as Bessemer on the date of the alleged incident because he spoke with staff via FaceTime. R. Doc. 51 at 3. The Defendants contend that Plaintiff's justification that Mr. Harvey confirmed the injuries is unnecessary because Plaintiff received medical attention at a hospital from physicians who were present in the room and could provide a superior confirmation. *Id.*

Mr. Harvey testified he was a licensed nurse practitioner who worked at the Bessemer Group Home in August 2021. Harvey Dep. 9, R. Doc. 51-3. He testified that he was the only LPN assigned to multiple homes, including Bessemer. *Id.* at 9-10. Mr. Harvey indicated that he was responsible for dispensing medication, transcribing orders, liaising between Bessemer and doctors, and preparing for state audits. *Id* at 10. He also testified that the direct care staff is responsible for administering medications to clients. *Id.* He testified that his work shift was from 8:00 a.m. to 5:00 p.m. *Id.* at 16.

Mr. Harvey testified that he saw Plaintiff "at least once a week, maybe a few times at the day program when he was there." *Id.* at 13. He denied that he had any responsibility concerning the water policies in place at the Group Home. *Id.* Mr. Harvey indicated that his responsibilities were limited to medical care, medications, and responding to emergency situations. *Id* at 13-14.

Mr. Harvey stated that clients were not injured often, but that he dealt with injuries when they occurred. *Id.* at 14-15. He testified that he learned about Plaintiff's injuries via phone call from the house manager, Thomika Taylor. *Id.* at 16. According to Mr. Harvey, Ms. Taylor stated that when she came in for her shift, Plaintiff was eating and she noticed he had a burn on his arm and hand. *Id.* Mr. Harvey testified that Ms. Taylor said she remembered that Plaintiff had showered before he came down to eat. *Id.* at 17. Mr. Harvey indicated that he told Ms. Taylor to take Plaintiff to his room and perform a body check. *Id.* During the body check, Mr. Harvey testified that Ms. Taylor discovered burns on other areas of Plaintiff's body including his thigh, stomach, and penal area. *Id.* at 18. Mr. Harvey testified that he told Ms. Taylor to take Plaintiff to the emergency room. *Id.* Mr. Harvey stated that he saw the burns on Plaintiff via FaceTime and thought he should go to the emergency room. *Id.* at 18-19.

Mr. Harvey did not remember seeing ashes in the area around Plaintiff's room during his FaceTime call with Ms. Taylor. *Id.* at 18. Mr. Harvey also testified that after Plaintiff was evaluated at Ochsner Medical Center, he did not return to Bessemer and the communications concerning Plaintiff ceased. *Id.* at 22.

Mr. Harvey testified that he notified the program administrator, Ms. Roukayatou Ousseyni, of the incident approximately forty-five minutes after he was notified by Ms. Taylor. *Id.* at 26. Mr. Harvey indicated that staff typically notifies the supervisors after they finished managing a situation and it is no longer an active emergency. *Id.* at 28.

Mr. Harvey also testified that during Plaintiff's time at Bessemer, he was not aware of any reports of Plaintiff eating inedible items. *Id.* at 33.

Mr. Harvey testified that Patrick Linar, the resident who allegedly admitted to harming Michael, tended to make up stories. *Id.* at 31. Mr. Harvey also stated that Mr. Lanier needed to be redirected for being untruthful at times. *Id.*

The Court finds that the deposition of Mr. Harvey was necessary because he instructed Ms. Taylor to send Plaintiff to the hospital due to his injuries. Mr. Harvey's testimony also indicates that he reported the incident to the program administrator and made her aware of Plaintiff's injuries. Mr. Harvey, however, did not provide any testimony as to causation. Nevertheless, the Court finds that the deposition of Mr. Harvey was relevant and proportional to the case.

### 4. Lillie Johnson

Plaintiff asserts that the deposition of Lillie Johnson, Defendants' Qualified Developmental Disability Professional, was necessary because she was intimately involved immediately after the incident. R. Doc. 43-1 at 5. Plaintiff claims that Mr. Johnson testified that she instructed Ms. Yvonne Hensley to search for burned clothes, but none were found. *Id.* Finally, Plaintiff claims that Ms. Johnson admitted that she created records that attributed statements to him that he was incapable of making. *Id.*

Defendants suggest that Plaintiff's summary mischaracterizes the testimony of Jessica McMillian and Lillie Johnson. R. Doc. 51 at 3. They provide no explanation of what constitutes the mischaracterization.

Lillie Johnson testified that at the time of the incident, she worked as a Qualified DEP for Defendants. Johnson Dep. 6, 8-9, R. Doc. 51-4. In her role as a QDEP, Ms. Johnson testified that it was her responsibility to make sure that clients understood that their rights were being protected. *Id.* at 8. She also testified she ensured clients' privacy

was protected and that their needs like food, clothing, and medical appointments were being met. *Id.* Ms. Johnson stated that she helped clients achieve their program goals and to learn tasks like brushing their teeth so they could become independent. *Id.*

Ms. Johnson testified that she was assigned to four group homes, including Bessemer. *Id.* at 10. She testified that she met Plaintiff during her visits to Bessemer and would interview him to see how he was doing. *Id.* Additionally, during her visits, Ms. Johnson testified that she would look at the condition of Plaintiff's home to ensure that he had food in the refrigerator and that he was doing computer work on the programs she had designed. *Id.*

Ms. Johnson also stated that the home manager was responsible for managing the home, which included monitoring the water log, and that she had no involvement with the water log. *Id.* at 11. If a client sustained an injury, Ms. Johnson testified that she would receive an injury report from GER, the computer system that staff was trained to use. *Id.* She also testified that she was required to sign a GER report on the computer. *Id.* at 12.

Ms. Johnson testified that Ms. Taylor called her from Ochsner Medical Center to notify her that Plaintiff had burns on his skin, and that he was being transferred to UMC because Ochsner did not have a burn unit. *Id.* at 14. Ms. Johnson further testified that she was not involved in the investigation related to Plaintiff's case. *Id.* at 15. She also stated that during a meeting with Plaintiff's family, she and Ms. Ousseyni could not explain how he sustained the burns. *Id.* at 16.

Ms. Johnson also testified that Patrick Linar, the resident who allegedly admitted to harming Plaintiff, did not always tell the truth. *Id.* at 24. She testified that this was due

to Mr. Linar's illness, which she described as a "cognitive impairment" coupled with hallucinations. *Id.*

Ms. Johnson also stated that Ms. Ousseyni asked her to search Plaintiff's home for the water logs from January 1, 2021 to December 3, 2021, but that she was unable to locate them. *Id.* at 25-26. Ms. Johnson stated she did locate log books from December 2021 forward. *Id.* at 28.

The Court finds that Ms. Johnson's testimony is duplicative of the testimony provided by other witnesses. Moreover, Plaintiff claims that Ms. Johnson testified that "[s]he instructed Ms. Yvonne Hensley to search for burned clothes (none were found)." R. Doc. 43-1 at 5. However, the deposition transcript does not include any testimony supporting this assertion. Because Ms. Johnson is an after-the-fact witness, who learned about the incident by phone from the house manager, her testimony is largely cumulative as she could not provide any information on how the incident occurred. Strategically, the Plaintiff could have deferred taking her testimony. The only possible value in Johnson's testimony is that she looked for logs during the period encompassing the incident and they were missing.

The Court therefore finds that two of the four depositions were not proportional to the needs of the case.

**B.  Requested Depositions**

The Court now turns to Plaintiff's request for additional depositions and the proposed additional deponents beyond the limit prescribed Rule 30(a)(2)(A)(i). At the hearing on June 28, 2023, counsel for Defendants represented to the Court that his clients have no objection to the depositions of Derrik, a maintenance employee; Kia Griffin, the

investigator assigned to Mr. Bachemin's case after Ms. O'Connor Eugene; and Thomika Taylor, the former house manager at the Bessemer Group Home who was the first individual who alerted others of Plaintiff's injuries. Given that these three witnesses are agreed to possess relevant information, these three will not count against Plaintiff. As such, Plaintiff has three remaining depositions.

The Court notes that it conducted this analysis with the information provided by the parties. If Plaintiff has conducted additional depositions since the submission date of this motion, then he must meet his burden to show that each deposition was relevant and proportional before the Court will permit Plaintiff additional depositions.

Plaintiff wants to depose "one to three hospital staff/physicians." During the hearing, the Court determined that these depositions will not be permitted because counsel for Plaintiff had not determined whether he would definitively depose them, nor did he identify them or establish the scope of testimony he would elicit. *See Talismanic Properties*, 309 F. Supp. 3d at 498 (denying plaintiff's request because it failed to identify proposed deponents).

Plaintiff also seeks to depose "Defendants' experts, if any." At the hearing, the Court determined it could not address that issue because it is too vague to permit the Court to make an assessment. The Court found that Plaintiff failed to make a particularized showing for additional depositions. *See id.*

Plaintiff also seeks to conduct a Rule 30(b)(6) deposition of the Louisiana Department of Health ("LDH"). According to Plaintiff, the documentary evidence suggests that the LDH investigated the Bessemer Group Home. Plaintiff seeks to obtain

information on the scope of the investigation, the resources with which the LDH conducted the investigation, and whether the Defendants "stymied" the investigation.

During the hearing, counsel for Plaintiff indicated that he would like to ascertain what weight the report should be assigned because the LDH closed the investigation without taking a position as to Bessemer Group Home. Plaintiff did not provide the report to the Court. The Court indicated that the lack of a finding by the state agency does not mean that the LDH conducted the investigation improperly. Accordingly, the Court denies this request.

Plaintiff also seeks to depose Ms. Debbie Allison to discuss her supervision of Ms. Ousseyni. *See* R. Doc. 43-1 at 6. Plaintiff claims that the questioning of Ms. Allison will reveal her awareness as to Ms. Ousseyni's operation of the Bessemer Group Home "in violation of DDMS policy" and whether Ms. Ousseyni was "permitting numerous policy violations to occur unchecked." *Id.* Plaintiff also claims he will question Ms. Allison regarding "other Louisiana group homes that have been cited for abuse, neglect, record keeping violations, and safety violations and the systemic nature of these violations," as well as the leadership of Mr. Swatley and Mr. Addison. *Id.*

In their opposition, Defendants did not object to the deposition of Ms. Allison. During the hearing, however, defense counsel asserted that Ms. Ousseyni already testified to the policies and procedures at Bessemer, and so the enlargement of the number of depositions to include Ms. Allison should not be permitted. Nevertheless, the Court determined that the deposition of Ms. Allison should occur because of her position as Ms. Oussenyi's supervisor, and her communications with Mr. Addison.

Plaintiff also seeks to depose Mr. Wayne Addison, the president of DDMS, and Terry Swatley, DDMS's CEO. Plaintiff argues he should be permitted to take the noticed depositions because the executives possess personal, superior, and unique knowledge concerning important facts germane to this matter. Plaintiff also contends that he seeks to depose the CEO and President to develop his LUTPA claim. He provides no further insight about the actual information he seeks from these executives.

Plaintiff argues that Defendants have failed to confer with opposing counsel in good faith in violation of Rule 37(a)(1). Plaintiff contends that he offered to compromise on the terms, length, or scope of the noticed depositions of Mr. Swatley and Mr. Addison. Plaintiff also contends that defense counsel failed to propose an alternative compromise under which the executives could be deposed.

The Defendants responded by filing a motion to quash the depositions and/or for a protective order. R. Doc. 45. The Defendants argue that Plaintiff's unilateral notices of the depositions of Mr. Addison and Mr. Swatley are unnecessary, not proportional to the needs of the case, are intended to harass the Defendants, and needlessly increase the costs of litigation. *Id*. The Defendants urged the Court to apply the "apex doctrine." They argue that under the apex doctrine, (1) Mr. Swatley and Mr. Addison should not be subjected to the depositions because they do not have unique or superior knowledge of relevant discoverable information, and (2) that Plaintiff must pursue less intrusive means of discovery before attempting to secure their testimony via deposition.

The Defendants do not address the meet and confer requirement in their submission. They simply argue that the depositions were for an improper purpose and are not proportional to the needs of the case. The Defendants further contend that Plaintiff's

21

offer to limit a deposition to three hours does not represent a compromise where they believe that a deposition is unnecessary and unduly burdensome.

Rule 26(c)(1) requires a movant seeking a protective to certify that they have in good faith conferred or attempted to confer with other parties in an attempt to resolve the issue without court action. Where, as here, the position is that the deposition should not occur and the motion is opposed, the Court excuses a failure to confer. *See Edrick Fuller v. CIG Financial, LLC*, No. 3:22-CV-1289-D, 2023 WL 6931342, at *2 (N.D. Tex. Oct. 19, 2023) (citing *Obregon v. Melton*, 2002 WL 1792086, at *1 n.3 (N.D. Tex. Aug. 2, 2002)) (declining to deny defendant's motion to quash based solely on its failure to comply with Rule 26(c)(1)); *Shaw Group Inc. v. Zurich American Insurance Co.*, No. 12-257-JJB, 2014 WL 4373197, at *3 (M.D. La. Sept. 3, 2014) (addressing the merits of defendant's motion to compel because defendant's communications could be seen to satisfy the meet and confer requirement).

The Defendants argue that Mr. Swatley and Mr. Addison should not be subjected to the depositions because they do not have unique or superior knowledge of discoverable information relevant to this case. The Defendants contend that neither Mr. Swatley nor Mr. Addison reside in the New Orleans area and do not provide direct oversight of the Bessemer Group Home. Instead, the Defendants argue, Mr. Swatley and Mr. Addison act solely as executives appointing a senior staff member to operate the facility.

The Defendants contend that under the apex doctrine, depositions of high-ranking corporate officials are either prohibited or significantly limited where the corporate executive has no personal knowledge of the subject matter of the litigation. The Defendants further contend that Plaintiff is required to obtain his discovery through less

intrusive means before attempting to secure testimony via deposition. In support of their position, the Defendants offer excerpts of the deposition testimony of Ms. Ousseyni and Ms. Yvonne Hensley.

Plaintiff argues that Mr. Swatley and Mr. Addison possess personal, superior, and unique knowledge concerning this case. Specifically, Plaintiff claims that Mr. Swatley and Mr. Addison managed DDMS, set the policies, and received a report concerning Plaintiff's injuries. R. Doc. 48 at 3-4. Plaintiff points to Defendants' website, which states that Mr. Swatley "is responsible for the overall operation of all facilities and programs," and that Mr. Addison is "responsible for the daily operation of all facilities and programs." *See* R. Doc. 43-5 at 3. Plaintiff asserts that the "overall" and "daily" operation of the Bessemer Group Home is directly relevant to his negligence claim that Defendants breached their duties to him. *See* Compl. ¶¶ 105-18.

Additionally, Plaintiff asserts that the depositions of Mr. Swatley and Mr. Addison are relevant to his LUTPA claim. Plaintiff claims that the Defendants' website describes its staff as "advocates" for their residents, but the Defendants do not employ executives with the relevant education necessary to advocate for individuals with disabilities. R. Doc. 1 ¶¶ 153-58.

There is no Fifth Circuit law which applies the apex doctrine to strictly prohibit the deposition of high-level, or apex, executives. *Turner v. Novartis Pharmaceuticals*, No. 10-0175, 2010 WL 5055828, at *3 (E.D. La. Dec. 2, 2010) (Roby, J.) (citing *Gautheier v. Union Pacific Railroad Co.*, 2018 WL 2467016 (E.D. Tex. June 18, 2008)). However, federal courts have permitted the depositions of apex executives when conduct and knowledge at the highest corporate levels of a defendant are relevant to the case. *Id./*

To determine whether to permit the deposition of an apex executive, federal courts have considered (1) whether the moving party can demonstrate that the executive possessed personal or superior and unique knowledge, and (2) whether the information could be obtained from lower-level employees or through less burdensome means, such as written interrogatories. *Pan American Life Insurance Co. v. Louisiana Acquisitions Corp.*, No. 13-5027, 2015 WL 4168435, at *4 (E.D. La. July 9, 2015) (citing *Turner*, 2010 WL 5055828, at *4); *see also Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979) (precluding deposition of executive where litigant had not deposed lower-level employee).

Further, this Court has quashed depositions when the party seeking the deposition was unable to demonstrate how the depositions sought were relevant to the claim. *Matter of Tara Crosby, LLC*, No. CV 17-05391, 2018 WL 3045799, at *4 (E.D. La. June 20, 2018) (citing *Turner*, 2010 WL 5055828, at *3-*4). In contrast, the Court has held that the deposition could occur if the party seeking the deposition was able to demonstrate the deposition was still necessary after utilizing less intrusive means of discovery. *Id.*

Here, Plaintiff has not provided the Court with any evidence that the depositions of Mr. Swatley have relevance to the case. According to Ms. Oussenyi's testimony, she was aware that her direct supervisor Ms. Debbie Allison, the director of operations, spoke with Mr. Addison about operational matters. Oussenyi Dep. 51, R. Doc. 48-5. Ms. Oussenyi testified that she would speak with Mr. Addison only when Ms. Allison was absent. *Id.* at 53-54. Additionally, Ms. Ousseyni and Ms. Hensley both testified that they never saw either executive at Bessemer helping with daily operations. *Id.* at 52; Hensley

Dep. 52-53, R. Doc. 48-6. Therefore, Plaintiff has not met his burden demonstrating that Mr. Swatley and Mr. Addison have specialized knowledge.

Finally, Ms. Ousseyni's deposition testimony indicates that the information Plaintiff seeks from the executives concerning the day-to-day management of Bessemer is available through lower-level employees and less onerous mechanisms of discovery. As Plaintiff has yet to depose Ms. Allison, the request to depose Mr. Addison is premature.

To the extent that Plaintiff seeks to question Mr. Swatley and Mr. Addison about their operational responsibilities, some of this information may be available through a Rule 30(b)(6) deposition. Similarly, Plaintiff's questions about the frequency of their visits to and inspections of Defendants' group homes were already answered by lower-level employees, some of whom testified that they did not know who Mr. Swatley and Mr. Addison were. Only after ascertaining Defendants' management structure and its operations may Plaintiff then depose Mr. Swatley and Mr. Addison. *See Turner*, 2010 5055828 at *3-*4 (quashing depositions of executives where plaintiff failed to first utilize a less intrusive Rule 30(b)(6) deposition).

Plaintiff also argues that deposing of Mr. Swatley and Mr. Addison about their education is relevant to his LUTPA claim and the alleged representation that they are advocates. A clear reading of the website indicates it was not the executives claiming to be advocates, but rather the company and its employees. Plaintiffs' reading of the websites conflates the literal reading of the site.

Plaintiff has failed to meet his burden under the apex doctrine because there is no evidence showing that Addison and Swatley possess superior or unique knowledge.

Second, Plaintiff has not yet deposed lower-level employees, such as Ms. Allison, who may possess the information Plaintiff seeks from the executives.

Plaintiff may, if appropriate, file a motion seeking permission to depose the executives at a later date should appropriate proof of the importance of the executives' testimony be developed. Therefore, the **Motion to Quash and/or for Protective Order** is **GRANTED**.

### C. Attorney's Fees

Defendants request attorney's fees in connection with this motion. They argue that they have attempted to resolve this matter amicably to no avail. They also argue that Plaintiff's failure to request a Rule 30(b)(6) deposition of the executives prior to unilaterally setting the depositions shows that Plaintiff's actions were not substantially justified or based on a genuine dispute. Additionally, it is suggested that Plaintiff's failure to meet the apex doctrine criteria warrants an assessment of attorney's fees.

Plaintiff argues that awarding attorneys' fees in this context is inappropriate because Defendants have failed to resolve this issue in good faith. Plaintiff asserts that he acted in good faith, and that his case presents serious claims such that justice would be served by discovering the cause of his injuries.

Rule 37(a)(5)(A) (via Rule 26(c)(3)) provides: "If the motion is granted–or if the disclosure or requested discovery is provided after the motion was filed–the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the

opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(a)(5)(A).

In determining substantial justification, the Supreme Court has clarified that "substantially justified does not mean 'justified to a high degree.' Rather, it means justified in substance, or that there is a genuine dispute." *Thomas v. Chambers*, No. 18-4373, 2019 WL 1544817, at *4 (E.D. La. Apr. 9, 2019) (Roby, J.) (quoting *Covad Communications Co. v. Revonet, Inc.*, 262 F.R.D. 1, 4 (D.D.C. 2009) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988))).

Having already excused the parties' failure to confer, the Court will address the second and third factors. The Court finds that Plaintiff's opposition to Defendants' motion to quash is not substantially justified because Plaintiff unilaterally scheduled the depositions of the Addison and Swatley.

The issue was whether Plaintiff established through the apex doctrine his need to take the executives' deposition. They did not. Nor has Plaintiff taken a corporate deposition to obtain the required information. Finally, in accordance with the apex doctrine, they have not deposed lower-level employees to secure relevant information from the Defendants. Therefore, Defendants' request for attorneys' fees associated with the motion pursuant to Rule 26(c)(3) and Rule 37(a)(5)(A) is **GRANTED**.

IV.     <u>**Conclusion**</u>

Accordingly,

**IT IS ORDERED** that Plaintiff's **Motion to Enlarge the Number of Permitted Depositions (R. Doc. 43)** is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' **Motion to Quash and/or for Protective Order (R. Doc. 45)** is **GRANTED**. Plaintiff may seek to lift the protective order only if evidence is developed satisfying the criteria of the apex doctrine.

**IT IS FURTHER ORDERED** that Defendants' request for attorney's fees in connection with the Motion to Quash and/or for a Protective Order is **GRANTED**.

**IT IS FURTHER ORDERED** that the Defendants shall file a motion to fix attorney fees into the record no later than **December 1, 2023**, along with: (1) an affidavit attesting to its attorney's education, background, skills and experience; (2) sufficient evidence of rates charged in similar cases by other local attorneys with similar experience, skill and reputation and; (3) the documentation required by Local Rule 54.2.

**IT IS FURTHER ORDERED** that any opposition to the fee application shall be filed no later than **December 8, 2023**. The motion shall be set for submission on **December 13, 2023**, to be heard without oral argument.

New Orleans, Louisiana, this 3rd day of November 2023.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**